UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────────────x

TEALA DAVIES,                                    Case No. 19 Civ. 10788

            Plaintiff,

     -against-                                **COMPLAINT
                                                 AND JURY DEMAND**

DARREN K. INDYKE and RICHARD D. KAHN,
as EXECUTORS OF THE ESTATE OF JEFFREY E.
EPSTEIN,

            Defendants.
──────────────────────────────────────x

       Plaintiff Teala Davies, by and through her attorneys, Cuti Hecker Wang LLP and Allred, Maroko & Goldberg, for her Complaint alleges as follows:

## NATURE OF THE ACTION

       1.     When Plaintiff Teala Davies was just seventeen years old, living on her own and working full-time to support herself, Jeffrey Epstein preyed open her, manipulated her to be completely dependent on him, and sexually abused her.

       2.     Epstein was presented to Teala as someone who had learned about her challenging circumstances and had the resources and interest to assist her – including by helping her to attend college and study abroad to see the world.  Teala was introduced to Epstein by her sister, but Teala was unaware that Epstein had been manipulating and sexually abusing her sister, as Epstein's total power and control over Teala's sister made it impossible for her to say anything about it.

       3.     During their early interactions, Epstein led Teala to believe that he would help her achieve her dream of becoming a translator, and he arranged for Teala to study abroad in Spain.  Teala gave up her job and her apartment in anticipation of this life-changing opportunity, leaving her completely dependent on Epstein and his continuing generosity.

4. Epstein exploited this power over seventeen-year-old Teala to sexually abuse her repeatedly. Ultimately, he raped and sexually assaulted her frequently and in a variety of places and settings, including by trafficking Teala to his homes in New York, New Mexico, Florida, the Virgin Islands, and France. He treated her like an object for his sexual gratification.

5. These assaults caused Teala to feel completely intimidated and fearful. She froze up and began to cry, able to think only about trying to survive.

6. Epstein continued to exert total control over Teala's life for two more years, trafficking her around the country and the world and sexually abusing her on a frequent basis. During this time, Teala felt deep despair and isolation, and developed a severe and self-destructive eating disorder. Still within his power and control, Teala confided in Epstein about her disorder, mistakenly believing that she could trust him. Rather than help her, Epstein cast her out within hours of her admission, sending her back to a place where she no longer had a home, a job or any resources or support.

7. Epstein's abuse destroyed Ms. Davies's life. She sank into alcoholism and other self-harm, unable to trust others but not understanding why.

8. At the same time, like so many childhood sex abuse victims, she did not comprehend how it had undone her or her life, or how it impacted her.

9. Now a working mother of three, Ms. Davies is still just beginning to understand the depth of the injuries from the sexual assaults that Epstein inflicted on her beginning when she was seventeen. She feels the toll of Epstein's abuse every day. She feels dysfunctional, on-edge, overwhelmed, and like she is on the verge of a psychological breakdown. She has difficulty sleeping and often has flashbacks to Epstein's abuse.

10. Epstein died in August 2019, before Ms. Davies or the countless other girls he preyed upon could obtain a modicum of justice.

11. Ms. Davies brings this action seeking, at last, some remedy for the egregious abuse that Epstein inflicted when she was a child.

## PARTIES

12. Plaintiff Teala Davies is an individual who resides in Arizona.

13. Defendants Darren K. Indyke and Richard D. Kahn are the Executors of the Estate of Jeffrey E. Epstein (the "Estate"). As Executors of the Estate, Defendants are liable for the acts and omissions of Epstein and his agents. For purposes of 28 U.S.C. § 1332, Defendants Indyke and Kahn are deemed to be citizens of the United States Virgin Islands, where Epstein was domiciled at the time of his death.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states and the amount in controversy exceeds $75,000.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

16. This Court has personal jurisdiction over Defendants. As Executors of the Estate, Defendants Indyke and Kahn are subject to personal jurisdiction in this Court because Epstein was subject to personal jurisdiction at the time of his death.

17. This Court had both specific and general personal jurisdiction over Epstein at the time of his death.

18. Epstein resided in New York State a substantial portion of the time during the time period at issue in this lawsuit, and through the time of his death.

19. Epstein resided in the Metropolitan Correctional Center in New York County at the time of his death.

20. Epstein conducted substantial business operations in New York.

21. Epstein owned and/or controlled numerous companies with principal places of business in New York.

22. Epstein owned substantial real property assets in New York, including the townhouse located at 9 East 71st Street in Manhattan, which is valued at $55 million or more.

23. New York was the epicenter of Epstein's criminal sex-trafficking enterprise.  For years, Epstein and his agents took actions in New York in order to arrange for minor girls to be trafficked to his homes throughout the country in order to perform sexual acts for him.  Epstein's trafficking and abuse of Ms. Davies was part of that New York-based criminal enterprise.

24. From his Manhattan townhouse, Epstein directed a vast network of agents in recruiting minor girls to be brought to him for his sexual use.

25. Epstein sexually abused many minor girls, including Ms. Davies, in his Manhattan townhouse.

26. On many occasions, Epstein and his agents made phone calls from New York to schedule appointments for minor girls to come to Epstein's residences outside of New York in order to perform commercial sexual acts for Epstein.

27. Upon information and belief, Epstein and/or his agents were present in New York when they took various actions to facilitate the trafficking of Ms. Davies for the purpose of performing sexual acts for Epstein.

## JURY DEMAND

28. Plaintiff hereby demands a trial by jury on all of her claims in this action.

**FACTUAL ALLEGATIONS**

29. When Plaintiff Teala Davies was seventeen years old, Jeffrey Epstein preyed upon her, manipulating her to be completely dependent on him and then sexually assaulting and raping her on numerous occasions. Epstein continued this pattern of manipulation and frequent sexual assault for years, leaving Ms. Davies with deep emotional wounds that she is still just beginning to grapple with.

30. By age seventeen, Teala had already lived through tremendously challenging circumstances. At eleven years old, she was homeless for a year, staying with various friends and seeing her mother only about once a week. At fifteen, Teala began working in order to support herself. At sixteen, Teala's living situation was again unstable, and she moved to Los Angeles to live with her older sister.

31. Teala initially tried to go to school in Los Angeles, but was unable to continue due to the need to work full-time to support herself. Teala lived with her sister and worked at a hair salon, eventually getting her GED. By the time Teala met Epstein, she had already been living on her own and working full-time for a year-and-a-half.

32. Teala's sister – who is five years older than her – had previously met Epstein and traveled with him. Teala's sister described Epstein to her as a generous wealthy person, and reported that he often helped make it possible for people to attend college. Teala's sister reported that Epstein had heard Teala's story and that he wanted to help.

33. Unbeknownst to Teala, Epstein had been manipulating and sexually abusing her sister. Teala had no idea that her sister had been involved in any type of sexual interactions with Epstein. Epstein's power and control of Teala's sister made it impossible for her to say anything.

34. Teala met Epstein for the first time in 2002, when she was seventeen years old. Epstein was visiting Los Angeles, and Teala drove with her sister to meet him at the Hotel Bel-Air.

35. During that first meeting, Epstein lay on a bed in his spacious hotel suite, fully clothed. He asked Teala's sister to massage his feet, then encouraged Teala to join her. Afterwards, Epstein took them shopping, and insisted on buying several items for Teala.

36. After that meeting, Epstein kept in touch with Teala through frequent phone calls. Epstein veered the conversation toward Teala's career goals and how Epstein could help her achieve them. He purported to want to help her and guide her to a better life.

37. Epstein offered to send Teala to school to learn hairdressing, but Teala made clear that this was not what she wanted to do in the long term. Teala explained that she had a passion for languages and for people, and that her dream was to be a translator.

38. Epstein claimed that he wanted to help Teala study to become a translator. He suggested that he would pay for Teala to study in Spain for a semester. Soon after, Epstein helped her to obtain a letter of recommendation from her high school counselor and helped her get accepted to study at the University of Madrid.

39. Teala was over the moon, feeling her dreams were coming true. Epstein made sure she felt that it was all his doing.

40. Teala prepared for this exciting opportunity to study abroad and pursue her dream career. She gave notice at her hairdressing job and gave up her apartment in Los Angeles, preparing to move to Spain.

41. Before Teala left for her school program, however, Epstein began what would become a long pattern of using her as his sexual object.

42. In approximately the summer of 2002, Epstein flew Teala and her sister to his ranch in New Mexico. Teala felt no reason to be wary of Epstein. He had been kind in their first meeting and had acted with generosity towards her.

43. When Teala got to Epstein's ranch, Epstein's close associates Ghislaine Maxwell and Sarah Kellen were there. Maxwell asked Teala questions about herself and took her horseback riding. Kellen invited Teala to go swimming.

44. After Teala swam, Epstein asked her to go into a massage room along with Kellen. Kellen began massaging Epstein, and Teala innocently joined in, as she had when her sister massaged Epstein's feet the first time.

45. At that point, Epstein began fondling Kellen and took off Kellen's shirt. Teala became very uncomfortable, as the massage had quickly and unexpectedly turned into a sexual encounter. Epstein reached inside Teala's bathing suit and fondled her genitals. Teala began crying, but Epstein continued to grope her as he masturbated to completion.

46. Teala felt extremely vulnerable. Epstein had arranged the circumstances to ensure that Teala was completely at his mercy. Teala had given up her job and her apartment in order to travel to Spain at Epstein's expense. If Epstein decided to rethink his generosity at any point, Teala would have had nothing, and would have been left homeless and jobless once again, after being brought so close to her dream. Even though Epstein had preyed upon her and sexually assaulted her, Teala understood she had no choice but to submit to him. His power over her was all-encompassing.

47. Epstein viciously exploited this power dynamic. In the summer and fall of 2002, he flew seventeen-year-old Teala to his homes in New York, Florida, and the U.S. Virgin Islands, sexually assaulting her in each of those locations.

48. In or around December 2002, Epstein flew Teala to stay at his townhouse

located at 9 East 71st Street in Manhattan. While they were in the dining room of the townhouse, Epstein without warning stuck his hand down Teala's pants and fondled her genitals. It was as if she were his toy.

49. In or around that same month, at Epstein's home in Florida, Epstein crept into Teala's bedroom while she was sleeping and raped her.

50. Also around that same month, at the private island Epstein owned in the Virgin Islands, Epstein ordered Teala to massage him, then proceeded to sexually assault her in the massage room.

51. Teala finally traveled to Spain to study in or around the end of 2002.

52. In early 2003, when Teala was still seventeen years old, Epstein flew her from Madrid to Paris. At his home in Paris, Epstein again crept into Teala's bedroom while she slept and raped her.

53. When Epstein inflicted these sexual assaults on Teala, she felt completely intimidated and fearful. All she could think about was trying to survive. Her body froze up, and she began crying.

54. After Teala's semester in Madrid, she had no home and no job. Instead, Epstein brought her to live a nomadic lifestyle in his close orbit. Teala traveled around the country with Epstein and his entourage, which generally included Maxwell, Kellen, and others. Virtually every few days, Epstein would bring Teala to a different home of his, including his Manhattan townhouse and throughout the country, where he continued to sexually assault her on a frequent basis. Epstein regularly used his private planes to traffic Teala into various locations for his sexual abuse of her.

55. Epstein had power over every aspect of Teala's life, and he had groomed Teala to be completely dependent on him and completely submissive to him. Epstein treated

Teala as a sexual object, using her body for his sexual gratification frequently and at his whim.

56. Eventually, by approximately 2004, Epstein arranged for Teala to live in an apartment at 301 East 66th Street in Manhattan, just blocks from his townhouse, when she was in New York.

57. This pattern – of Epstein exercising total control over Teala's life and using her as a sexual object whenever he desired – continued throughout 2003 and 2004. Epstein arranged for Teala to study abroad two more times, apparently when he grew bored with having her around. Each time, Teala lived in this nomadic orbit with Epstein both before and after traveling to attend school.

58. Epstein also tried to introduce Teala to his "friends" and essentially offer her as a sexual object to them. In one instance, Epstein had Teala spend time with a well-known Hollywood producer, who then demanded and attempted to engage in abusive sexual behavior. Teala barely escaped.

59. By 2004, Teala felt deep despair and isolation. There was no one she could talk to about what Epstein was doing to her. Instead, Epstein had ensured that she thought he was the only person in her life whom she could trust.

60. Teala developed a severe eating disorder, for the first time, in or around 2004. After she had struggled with the disorder for six months or a year, it became too much to bear. She confided in Epstein about the eating disorder, still manipulated into thinking he was someone she could trust.

61. Instead, from the moment Epstein learned of Teala's self-destructive behavior, he immediately cast her out. Literally within hours of Teala anxiously confessing to Epstein that she did not know why, but had a compulsive need to binge and purge, he threw her out. He instructed her to pack up her belongings and arranged for her to be flown to Arizona.

62. But there was nothing left for her in Arizona. She still had no idea what had happened to her and felt it was all her fault.

63. Epstein's abuse destroyed Teala's life. After being cast out by him after two years of a lavish, if abusive, lifestyle, she sank into alcoholism and other self-harm, unable to trust others but not understanding why.

64. Ms. Davies is now a working mother raising three children. She is still struggling to put her life back together.

65. Ms. Davies is still in the nascent stages of understanding the deep and lasting injuries that Epstein's pattern of abuse has caused her, but she feels the effects every day. She feels dysfunctional, on-edge, and constantly overwhelmed. She has difficulty sleeping. She often has flashbacks to Epstein's sexual assaults. She feels like she is on the verge of a psychological breakdown.

66. This action is timely under the law of each jurisdiction whose law might be determined to govern Ms. Davies's claims or aspects thereof, including without limitation New York, New Mexico, Florida, and the Virgin Islands.

67. Ms. Davies still has not disclosed her abuse to a licensed medical or mental health care provider in the context of receiving health care from the provider.

68. Ms. Davies is still just beginning to process and understand the full extent of the injuries that Epstein's abuse had caused her and the connection between Epstein's abuse and the emotional and psychological injuries she had experienced.

69. This action is timely under New York law because it falls within New York CPLR 214-g and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual

offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Ms. Davies when she was less than eighteen years of age.

70. Epstein's conduct constitutes "childhood sexual abuse" within the meaning of New Mexico Stat. § 37-1-30 and "abuse" within the meaning of Florida Stat. § 95.11(7).

**FIRST CAUSE OF ACTION**
**(Battery)**

71. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

72. In committing the acts described above, Epstein intentionally subjected Plaintiff to bodily contact that was offensive in nature.

73. Epstein intentionally touched Plaintiff in a rude, insolent, or angry manner.

74. As a result of Epstein's actions, Plaintiff suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Assault)**

75. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

76. In committing the acts described above, Epstein engaged in physical conduct that placed Plaintiff in imminent apprehension that he would harm her.

77. As a result of Epstein's actions, Plaintiff suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

78. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

79. In committing the acts described above, Epstein engaged in extreme and outrageous conduct.

80. In doing so, Epstein acted with the intent to cause and/or disregard of a substantial likelihood of causing Plaintiff to suffer severe emotional distress.

81. As a direct result of Epstein's actions, Plaintiff suffered severe emotional distress.

82. As a result of Epstein's actions, Plaintiff suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a. Awarding compensatory damages for all physical injuries, emotional distress, psychological harm, anxiety, humiliation, physical and emotional pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

b. Awarding punitive damages in an amount to be determined at trial;

c. Awarding attorneys' fees and costs pursuant to any applicable statute or law;

d. Awarding pre- and post-judgment interest on all such damages, fees and/or costs;

e. Attaching all of Defendants' real property and other assets located in the State of New York pursuant to New York CPLR 6201 *et seq.* and Federal Rule of Civil Procedure 64; and

f. Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
November 21, 2019

CUTI HECKER WANG LLP

By: /s/ Mariann Meier Wang
Mariann Meier Wang
Daniel Mullkoff
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603
mwang@chwllp.com

ALLRED, MAROKO & GOLDBERG
Gloria Allred
305 Broadway, Suite 607
New York, New York 10007
(212) 202-2966

*Attorneys for Plaintiff*